

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## AP-75,879

### JUAN LIZCANO, Appellant

### v.

### THE STATE OF TEXAS

### Appeal from Case F05-59563-QS of the
### 282nd Judicial District Court of
### Dallas County

*WOMACK, J., delivered the opinion of the Court, in which KELLER, P.J., and MEYERS, KEASLER, HERVEY, and COCHRAN, JJ., joined. PRICE, J., filed a concurring and dissenting opinion, in which HOLCOMB and JOHNSON, JJ., joined.*

A jury convicted Juan Lizcano of capital murder on October 9, 2007. Pursuant to the jury's findings on special issues about future-dangerousness, mitigation, and mental-retardation, the trial court sentenced the appellant to death. The appellant now raises seventy-nine points of error on direct appeal to this Court.[1] Finding no reversible error, we affirm the judgment and

---

[1] *See* CODE CRIM. PROC. art 37.071, § 2(h) ("The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals.").

sentence of the trial court.

## I. Background

The appellant and Jose Fernandez, a friend, spent the evening of Saturday, November 13, 2005, at a dance club in Dallas. Fernandez testified at the appellant's trial that they arrived around 10:00 or 11:00 p.m. and consumed three beers each, leaving around 1:00 a.m. on Sunday morning. As the appellant drove them home in his truck, Fernandez overheard the appellant talking on his cell phone to Marta Cruz, his girlfriend. The appellant told Cruz "if she was with another person, he was going to kill her. He's going to kill her and him." The appellant then drove with Fernandez to the apartment the appellant shared with his uncle and brother. The appellant took his uncle's revolver and continued to Cruz's house. Fernandez stayed in the truck while the appellant went inside.

Marta Cruz testified that the appellant knocked on her door around 2:00 a.m. on Sunday morning. After she let him inside, the appellant pointed the revolver at her head. Then he fired one shot into the ceiling. Cruz said the appellant told her that "[t]he next shot was for me. That I was next. The next one was for me." The appellant left the house after about ten minutes. Cruz immediately called 911.

Before the police arrived, Cruz called Fernandez to find out if he knew that the appellant had a gun. When Fernandez answered, Cruz learned that he was with the appellant. She asked Fernandez to tell the appellant not to come back to her house because the police were looking for him. But the appellant called Cruz and told her that he "didn't give a damn. He just didn't care."

Officer Lori Rangel was one of the officers who responded to Cruz's first 911 call. Officer Rangel testified that after Cruz described the incident with the appellant, Officer Rangel

searched the surrounding area, but did not find the appellant or his truck. Following the unsuccessful search, Cruz told Officer Rangel that she did not need anyone to continue waiting with her, so Officer Rangel left the house.

Cruz received another call from the appellant after Officer Rangel left. The appellant said "that he could see that there was no police. That I was lying." A couple of minutes later, the appellant began kicking her side door to gain entry. Cruz hid in a closet. She called 911 while the appellant continued trying to kick through the door. Eventually, police officers arrived at Cruz's house and the appellant's kicking stopped.

Several police officers testified about the events following Cruz's second 911 call. Officer David Gilmore saw the appellant run from the back yard into an alley behind the house. Several officers then searched the alley. A marked police vehicle led officers on foot, and a police helicopter hovered above. Officers Brad Ellis, Richard Rivas, Francis Crump, and Raymond McClain described scrambling for cover as the appellant fired at least three shots at them from behind a tree in the alley. The appellant then ran from the alley, toward the front of the house.

While other officers searched the back alley, Officer Brian Jackson took an AR-15 rifle from his police vehicle and moved into a position at the front of the house. After the appellant ran to the front of the house, officers heard the appellant's revolver fire one shot, followed by Officer Jackson's rifle firing three shots. As the officers converged on the front yard, they found Officer Jackson fatally wounded and the appellant lying on the ground behind a trash can. His revolver lay empty on the ground two or three feet from his head. According to Chief Medical Examiner Dr. Jeffrey Barnard, the appellant's shot traveled through Officer Jackson's right arm

and then into his heart, killing him within ten to fifteen seconds.

At trial, the appellant did not contest that he had fired the fatal shot. He did, however, challenge the State's theory that he fired first and that he knew Officer Jackson was a police officer.

## II. JURY SELECTION

### A. *Batson* Challenges

In points of error one through six, the appellant argues that the State exercised peremptory challenges to strike six black venire members in violation of the Equal Protection Clause of the United States Constitution and *Batson v. Kentucky*.[2] In *Batson*, the United States Supreme Court held that while a prosecutor ordinarily may exercise peremptory challenges for any reason related to his views concerning the outcome of the trial, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race ...."[3] The Supreme Court articulated the procedure for bringing a *Batson* challenge in *Purkett v. Elem*[4]:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.[5]

---

[2] 476 U.S. 79 (1986).

[3] *Id.*, at 89.

[4] 514 U.S. 765 (1995).

[5] *Id.*, at 767; *see also Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Cr. App. 2008), *cert. denied*, 129 S. Ct. 22 (2008) (quoting *Purkett*).

### 1. Standard of Review

The ultimate burden of persuasion rests with the opponent of the strike to establish by a preponderance of the evidence that the strike was the product of the proponent's purposeful discrimination.[6] The appellant concedes that the State offered race-neutral explanations for the six challenged venire members, but argues that the trial court erred because the State's explanations were a pretext for racial discrimination. Therefore, the only issue before us is whether the trial court erred in finding that the appellant did not prove purposeful racial discrimination by a preponderance of the evidence.

On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.[7] This deferential standard of review is due to the trial court's ability to make determinations about an attorney's credibility and demeanor: "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge."[8]

### 2. Analysis

This Court has identified a number of relevant factors that may be considered by a trial court in determining discriminatory intent.[9] The appellant argues two of these factors on appeal: (a) the State disproportionately eliminated black venire members in striking six out of the eight black venire members on the qualified panel of forty-seven total venire members, and (b) the

---

[6] *Watkins*, 245 S.W.3d, at 447.

[7] *Snyder v. Louisiana*, 128 S. Ct. 1203, 1207 (2008); *see also Gibson v. State*, 144 S.W.3d 530, 533-34 (Tex. Cr. App. 2004).

[8] *Snyder*, 128 S. Ct., at 1208 (citing *Hernandez v. New York*, 500 U.S. 352 (1991)).

[9] *See, e.g., Watkins*, 245 S.W.3d, at 448-49; *Keeton v. State*, 749 S.W.2d 861, 868 (Tex. Cr. App. 1988).

answers given by the stricken black venire members in response to *voir dire* questioning were similar to answers given by non-black venire members who were not struck.

## a. Proportionality of Strikes

The record from the *Batson* hearing conducted by the trial court indicates that a total of forty-seven venire members were found qualified after individual *voir dire*. Of these forty-seven, eight were black, thirty-two were white, six were Hispanic, and one was of an "other" race.[10] The State exercised peremptory challenges against six black, seven white, two Hispanic, and the one "other" venire member. The appellant exercised peremptory challenges against no black, sixteen white, and two Hispanic venire members. Ultimately, the jury consisted of two black, eight white, and two Hispanic jurors and one white alternate juror.[11]

The appellant encourages us to determine proportionality by simply comparing the number of black venire members struck by the State to the total number of black venire members: 6 of 8, or 75%.[12] The State would have us compare the number of black jurors to the total number of jurors plus the alternate juror (2 of 13, or 15%), and compare that percentage with the percentage of black jurors that would be expected from a random selection from the qualified venire (8 of 47, or 17%).[13] We also could analyze the data using a number of other

---

[10] We will use the racial classifications that appear to be most commonly used by the parties at the *Batson* hearing. We note, however, that the terms "African-American" and "black" were used interchangeably, and the venire member of the "other" race was specifically recognized on occasion as Indian.

[11] During the *Batson* hearing, the parties included the alternate juror and strikes in the analysis.

[12] *See Miller-El v. Dretke*, 545 U.S. 231, 240-41 (2005).

[13] *Watkins*, 245 S.W.3d at 451.

statistical techniques found in decisions of the United States Supreme Court and this Court.[14]

The parties have not provided analysis of why any one technique would be preferable to determine proportionality under the facts of the present case. Because the record does not indicate which, if any, of these techniques the trial court relied upon, we will not decide which technique is preferable.[15] Instead, we simply observe that certain techniques yield statistics favoring the appellant and certain techniques yield statistics favoring the State. Therefore, this factor does not support the appellant's contention that the trial court's ruling was clearly erroneous, and we look next to the appellant's comparative juror analysis.

### b. Comparative Juror Analysis

The United States Court of Appeals for the Fifth Circuit recently extracted key principles from the United States Supreme Court decision in *Miller-El v. Dretke* to help guide comparative juror analyses:

---

[14] We could compare the number of black venire members struck by the State to the total number of black venire members (75%), and then compare that percentage to the percentage of white venire members struck by the State from the total number of white venire members (22%). *Miller-El v. Cockrell*, 537 U.S. 322, 331 (2003). We could compare the number of black venire members struck by the State to the total number of black venire members (75%), and then compare that percentage with the percentage of non-black venire members struck by the State from the total number of non-black venire members (26%). *Id.* In light of the multiple racial classification involved, perhaps we should instead compare the number of black venire members struck by the State to the total number of black venire members (75%), and then compare that percentage with the percentages of each racial classification of non-black venire members struck by the State from the totals within the venire (22% white, 33% Hispanic, 100% other). We could also compare the percentage of its allotted peremptory challenges that the State exercised on black venire members (6 divided by 16, or 37.5%) to the percentage of black venire members within the total venire (8 divided by 47, or 17%). *Watkins*, 245 S.W.3d, at 451. Finally, we could compare the percentage of its allotted peremptory challenges that the State exercised on black venire members (37.5%) to the percentage of black venire members struck by the State from the total number of black venire members (75%). *Miller-El v. Cockrell*, 537 U.S., at 342 (finding 10 of 14 strikes used to remove 91% of eligible African-American venire members "raise[d] some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors").

[15] Each of these techniques presents its own analytical difficulties, particularly because (i) the analysis becomes less meaningful as the number of identified racial classifications grows larger and the number of individuals within each classification shrinks, (ii) the appellant's peremptory challenges can dramatically affect the statistics, and (iii) the relevance of the numbers produced by several techniques is not clear.

First, we do not need to compare jurors that exhibit all of the exact same characteristics. If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects. Second, if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination. Third, we must consider only the State's asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors.[16]

The primary reason asserted by the State for striking five of the six black venire members at issue was that they were among eight venire members who circled a specific answer to a specific question on the jury questionnaire. The answer indicated that, although they did not believe that the death penalty ever ought to be invoked, as long as the law provides for it they could assess it under the proper circumstances. A venire member's responses to a written questionnaire can be valid grounds for a peremptory challenge.[17] Because the State struck all eight venire members who shared the characteristic of circling this answer, including three non-black venire members, the appellant has not demonstrated that the State's reason for striking those five black venire members was a pretext for discrimination.

The State offered four reasons for striking the sixth black venire member, R. Howard: (i) he preferred a sentence of life in prison to the death penalty; (ii) he was argumentative and became alienated during *voir dire*; (iii) he would hold the State to a burden of proof higher than

---

[16] *Reed v. Quarterman*, 555 F.3d 364, 376 (5th Cir. 2009).

[17] *Jasper v. State*, 61 S.W.3d 413, 422 (Tex. Cr. App. 2001). In particular, we have previously denied a *Batson* claim where the State's reason for using a peremptory challenge was that a venire member circled this precise answer. In *Camacho v. State*, 864 S.W.2d 524, 529 (Tex. Cr. App. 1996), we held that the appellant did not satisfy his burden of persuasion in a comparative juror analysis where all venire members who circled a "bad" response to this question, including non-black venire members, were struck by the State.

beyond a reasonable doubt; and (iv) he would prefer a sentence of life in prison if the evidence of guilt was sufficient, but weak. The appellant argues that the record does not support the State's reasons and that Howard's responses to *voir dire* questioning suggest that he would have been a strong juror for the State.

Our review of the record reveals that there is evidence supporting the State's reasons for striking Howard; indeed, the State attempted to challenge Howard for cause on the basis of the third and fourth reasons. More importantly, the appellant has failed to identify any non-black jurors with characteristics similar to Howard who were not struck by the State, thus providing no comparison. As the appellant bears the burden of persuasion, we decline to scour the extensive record to find an appropriate comparison.

Because neither the proportionality nor the comparative-juror-analysis factor weighs in favor of a finding that the trial court's ruling was clearly erroneous, points of error one through six are overruled.

### B. Appellant's Challenges for Cause

In points of error seven through fifteen, the appellant argues that the trial court erred in denying his challenges of nine venire members for cause. In *Johnson v. State*, we reaffirmed that harm arising from erroneous denial of challenges for cause is "demonstrated, and the error held reversible, when the appellant (1) exercised his peremptory challenges on the venire member whom the trial court erroneously failed to excuse for cause, (2) exhausted his peremptory challenges, (3) was denied a request for additional peremptory challenges, and (4) *identified an*

*objectionable juror who sat on the case.*"[18] Here, the appellant failed to identify an objectionable juror who sat on the jury at the appellant's trial.

At the conclusion of *voir dire*, the State and the appellant each exercised their full allotment of fifteen peremptory challenges. In addition, the appellant exercised two additional peremptory challenges granted by the trial court. When the State and the appellant had exhausted the last of their peremptory challenges, only nine venire members had been seated as jurors. The trial court therefore seated the next three venire members: L. Morris, L. Jackson, and A. Perez.

After the appellant had used his last peremptory strike and before the final three jurors were seated, the appellant requested additional peremptory strikes but failed to identify an objectionable juror who sat on the case:

> DEFENSE COUNSEL: Your Honor, we will exercise that peremptory challenge on Ms. Lee. Your Honor, we will ask an additional peremptory challenge. We are out of them now and there are jurors that will be placed on the jury that we have attempted to get off for cause and are objectionable and prejudiced against the Defendant in violation of his rights under Article one, section ten of the – ten, fifteen, nineteen and twenty-nine of the Texas Constitution, the Sixth and Fourteenth Amendment of the United States Constitution, and request extra strikes – an extra strike, and they were challenged for cause for bias, which we, you know, brought to the Court's attention, and we would need to use a peremptory challenge on them to keep them off the jury.
>
> …
>
> [I]t is my understanding that per the agreement with the Court and Counsel … that [Defense Counsel] was allowed to specify her peremptory challenges for people that were challenged by the Defense for cause and that challenge was overruled by the trial court, and I think there was a total of seven of them, and beginning with the first one, going through seven, we would state that the Court erred in not granting the challenge for cause, and in successive order, we have had to challenge these people as objectionable jurors that would have ended up on the

---

[18] 43 S.W.3d 1, 5-6 (Tex. Cr. App. 2001) (emphasis added) (citing *Wolfe v. State*, 147 Tex. Crim. 62, 178 S.W.2d 274 (1944) (op. on reh'g)).

jury if we hadn't used peremptory challenges, therefore, using up our peremptory challenges on jurors that should not have been in the strike zone.

THE COURT: That will be denied. And that results in Morris being juror 10, Jackson, juror 11, and Perez being juror 12.

Defense counsel's statements do not identify Morris, Jackson, and Perez as objectionable jurors because the record shows that none of these individuals were challenged by either party for cause during individual *voir dire*. Additionally, on appeal, the appellant identifies each of the nine venire members whom the appellant actually struck as an "objectionable juror" and states that because the appellant had exhausted his peremptory challenges on these objectionable jurors, he "was required to accept an 'objectionable' juror on the jury."

Ultimately, the appellant failed both at trial and on appeal to identify any specific, objectionable juror who actually sat on the jury during the trial. Because the appellant has not established one of the four necessary elements to show harm, we find it unnecessary to review the merits of the trial court's ruling on each venire member.[19] Points of error seven through fifteen are overruled.

## C. State's Challenges for Cause

In points of error sixteen and seventeen, the appellant argues that the trial court erred in granting the State's challenges for cause of venire members G. Jefferson and N. Miller Phillips. The appellant argues that these venire members did not exhibit bias and could follow the law.

A venire member is challengeable for cause if his beliefs against capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with

---

[19] *Cf. Saldano v. State*, 232 S.W.3d 77, 92 (Tex. Cr. App. 2007) (analyzing denial of challenges for cause on the merits where appellant demonstrated harm by identifying a specific individual as an objectionable juror).

the court's instructions and the juror's oath.[20] A venire member who can set aside his beliefs against capital punishment and honestly answer the special issues is not challengeable for cause.[21] We review a trial court's ruling on a challenge for cause with considerable deference because the trial court is in the best position to evaluate the venire member's demeanor and responses.[22] When the venire member's answers are vacillating, unclear, or contradictory, particular deference is accorded to the trial court's decision.[23] We will reverse a trial court's ruling on a challenge for cause only if a clear abuse of discretion is evident.[24]

Jefferson ultimately stated that she could not perform her duties as a juror in accordance with the juror's oath. During *voir dire*, Jefferson vacillated about her ability to take the juror's oath due to her religious beliefs. The trial court then posed several questions directly to her:

> THE COURT: Well, let me ask a few questions. I think you are intelligent enough – certainly intelligent, and you understand you said some conflict – you have made some conflicting answers.
>
> [JEFFERSON]: Uh-huh.
>
> THE COURT: You agree with that, don't you, Ms. Jefferson –
>
> [JEFFERSON]: Yes, sir.
>
> THE COURT: – from talking to these lawyers. Let me ask you this and I'll just

---

[20] *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Cr. App. 1998); *see also* TEX. CODE CRIM. PROC. art 35.16(b).

[21] *Colburn*, 966 S.W.2d, at 517; *see also Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) ("[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.").

[22] *Smith v. State*, 297 S.W.3d 260, 268 (Tex. Cr. App. 2009).

[23] *Colburn*, 966 S.W.2d, at 517.

[24] *Id.*

leave it at that: To sit on the jury, you have to take that oath that both sides have been talking to you about, that you can a true verdict render according to the law and evidence, and that would mean that if the – you believe that the State proved that the person on trial was guilty beyond a reasonable doubt, that you could find the person guilty. And if you didn't, you would find the person not guilty.

[JEFFERSON]: Yes, sir.

THE COURT: Can you take the oath and follow the law as to whether or not to find someone guilty or not guilty.

[JEFFERSON]: I couldn't take it. I can't take the oath, at least not at this time, without finding out from my church how they feel about that, sir.

THE COURT: Well, we're just not – under our procedure, we can't wait until you have had an opportunity to talk to your church, so I need a "yes" or "no" answer at this time.

[JEFFERSON]: No, sir, not at this time.

Because Jefferson vacillated about whether she could impose the death penalty, and ultimately stated to the trial court that she could not take the juror's oath, the trial court did not abuse its discretion in granting the State's challenge.

Miller Phillips was originally examined on June 27, 2007, and also made conflicting statements with respect to her ability to impose the death penalty. At the beginning of questioning she stated, "I'm not in favor of … putting someone to death. I'm not in favor of death under any circumstances. In all honesty, I find it ludicrous that we can't kill stem cells, but we can kill an individual. That just does not make any sense to me." As questioning proceeded, however, she indicated that she could perform her duties as a juror.

Several weeks after her initial questioning, Miller Phillips contacted the court coordinator with concerns about her ability to serve on the jury. She subsequently retained counsel and appeared in court with counsel on September 4, 2007, to inform the trial court that she could not

perform her duties as a juror: "Well, after much thought and deliberations and a great deal of soul searching, I have concluded that I cannot bring myself to … find another person to death [*sic*]. I cannot do that. I find it morally and ethically wrong." Miller Phillips stated further, "I would not in … good conscience be able to answer [the special issues] in such a way that it would lead to the death of another human being." She did not waver from this position during further questioning by defense counsel.

Because Miller Phillips expressly informed the trial court that she would be unable to impose the death penalty, the trial court did not abuse its discretion in granting the State's challenge.[25] Points of error sixteen and seventeen are overruled.

### D. Lawfully Constituted Jury

In point of error eighteen, the appellant argues that the errors claimed in points of error one through seventeen violate the United States Constitution by "depriv[ing] Appellant of a lawfully constituted unbiased and non prejudicial group of jurors, all of which should have been qualified according to the law." The appellant also states that our holding in *Jones v. State*[26] is "constitutionally illusory erroneous and barbaric in its application." In point of error nineteen, the appellant repeats point of error eighteen, but substitutes the Texas Constitution.

As we have found no error in the selection of qualified jurors, points of error eighteen and nineteen are overruled.

---

[25] *See, e.g., Blue v. State*, 125 S.W.3d 491, 499 (Tex. Cr. App. 2003) (finding that trial court did not abuse its discretion by granting State's challenge for cause where juror gave conflicting answers about her ability to follow the law).

[26] 982 S.W.2d 386 (Tex. Cr. App. 1998).

## III. MENTAL RETARDATION

### A. Psychological Examination

In points of error twenty and twenty-one, the appellant argues that he was compelled to submit to a psychological examination conducted by the State in violation of the Fifth Amendment to the United States Constitution and Article I, Sections 9 and 10 of the Texas Constitution. The appellant fails to provide any distinction between his state and federal constitutional arguments. Therefore, we will analyze only his federal claims.[27]

In *Lagrone v. State*, we held that "when the defense demonstrates the intent to put on future dangerousness expert testimony, trial courts may order defendants to submit to an independent, state-sponsored psychiatric exam prior to the actual presentation of the defense's expert testimony."[28] Then in *Chamberlain v. State*,[29] we discussed the broader principle of *Lagrone*:

> [I]f a defendant breaks his silence to speak to his own psychiatric expert and introduces that testimony which is based on such interview, he has constructively taken the stand and waived his fifth amendment right to refuse to submit to the State's psychiatric experts…. Appellant cannot claim a fifth amendment privilege in refusing to submit to the State's psychiatric examinations and then introduce evidence gained through his participation in

---

[27] *See, e.g., Lagrone v. State*, 942 S.W.2d 602, 612 (Tex. Cr. App. 1997) (declining to address state constitutional error where appellant "failed to provide us with any distinction or reason that the Texas Constitution provides greater protection than the Fifth Amendment").

[28] 942 S.W.2d, at 612. In *Lagrone*, we first discussed our holding in *Soria v. State*, 933 S.W.2d 46 (Tex. Cr. App. 1996), that testimony by an expert witness could be interpreted as a waiver of Fifth Amendment protections: "[O]ur decision in *Soria* stands for the proposition that once a defendant has executed a limited waiver of the Fifth Amendment's protection by constructively testifying through an expert on the issue of future dangerousness, the trial court may order that defendant to submit to a state-sponsored future dangerousness examination." We then extended *Soria* "to allow trial courts to order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, or plans to introduce, its own future dangerousness expert testimony."

[29] 998 S.W.2d 230 (Tex. Cr. App. 1999).

his own psychiatric examination.[30]

The immediate question before us is whether the holding in *Lagrone* may be extended to psychological examinations to determine mental retardation. We hold that when the defense demonstrates the intent to introduce evidence of the defendant's mental retardation through psychological examinations conducted by defense experts, the trial court may order the defendant to submit to an independent, state-sponsored psychological examination on the issue of mental retardation. As we stated in *Lagrone*, "[o]ur sense of justice will not tolerate allowing criminal defendants to testify through the defense expert and then use the Fifth Amendment privilege against self-incrimination to shield themselves from cross-examination on the issues which they have put in dispute."[31] The precise nature of the psychological testimony to be presented is immaterial; that it is being presented by the defendant is enough to trigger the rule.[32]

The trial in this case began on October 1, 2007. On April 20, 2007, by order of the trial court, the appellant had filed a declaration of his intent to claim mental retardation as a bar to the death penalty. On the same day, the State filed a motion to compel the appellant to submit to an examination by the State's expert to determine whether he was mentally retarded. The trial court granted the State's motion, and further ordered that (i) the appellant's and State's experts make the raw test data and notes from their evaluations available to the opposing expert, and (ii) neither expert disclose the underlying facts or data to the attorneys without prior judicial

---

[30] *Id.*, at 234.

[31] 942 S.W.2d, at 611.

[32] While unpublished opinions cannot be cited by parties as legal authority, our unpublished opinion in *Ward v. State*, No. AP 74695, 2007 WL 1492080 (Tex. Cr. App. May 23, 2007), provides an example of how *Lagrone* was applied with respect to mitigation issues.

authorization. At a pretrial hearing on June 1, 2007, the appellant objected to the examination primarily on the grounds that it should be conducted only after the appellant had actually introduced expert testimony on the issue of mental retardation at trial. In response, the trial court revised its order to prohibit the State's expert from talking with the appellant about the facts of the underlying offense. The appellant now argues that the examination was unconstitutional, but does not discuss the timing of the examination.[33]

We conclude that the trial court's order did not violate the appellant's Fifth Amendment rights, particularly where the trial court adopted the prophylactic measures of ordering the experts not to disclose underlying facts or data to the attorneys without prior judicial authorization, and ordering the state's expert not to question the appellant regarding the offense. Points of error twenty and twenty-one are overruled.

### B. Pretrial Determination of Mental Retardation

In point of error twenty-two, the appellant argues that the trial court denied him due process of law by refusing to empanel a separate jury to make the mental-retardation determination before trial. In point of error twenty-three, the appellant argues that the trial court denied him due process of law by refusing to make the mental-retardation determination itself before trial. In point of error twenty-four, the appellant states that the trial court denied him due process of law by refusing to allow him to offer evidence of mental retardation before the trial.

---

[33] To support his argument on appeal, the appellant simply cites to *Sanchez v. State*, 707 S.W.2d 575 (Tex. Cr. App. 1980), without explaining how it applies. In *Sanchez*, we held that pursuant to Article I, Section 10 of the Texas Constitution, when a defendant is arrested, he has the right to remain silent and the right not to have that silence used against him, even for impeachment purposes, regardless of when he is advised of those rights.

Point of error twenty-four is not briefed and is therefore overruled.[34]

In *Atkins v. Virginia*,[35] the United States Supreme Court held that the execution of mentally retarded persons violates the Eighth Amendment's prohibition of cruel and unusual punishment, but left to the states the task of developing appropriate ways to enforce this constitutional restriction. This Court has consistently held that a determination of mental retardation during the punishment phase of trial is sufficient to protect a defendant's Eighth Amendment rights.[36] In *Neal v. State*, we explained that "the nature of the offense itself may be relevant to a determination of mental retardation; thus, a jury already familiar with the evidence presented at the guilt stage might be especially well prepared to determine mental retardation."[37]

The appellant fails to cite any binding authority for the proposition that punishment-phase determinations of mental retardation are a violation of due process. While his policy arguments could be considered by the legislature if it chooses to enact a statutory response to *Atkins*, we decline to overturn established precedent. Points of error twenty-two and twenty-three are overruled.

### C. Mitigation Report Underlying Expert Opinions

In point of error thirty, the appellant argues that the trial court erred in requiring the appellant to produce the facts and data underlying the opinions of his mental-retardation experts

---

[34] TEX. R. APP. P. 38.1(i) (The appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

[35] 536 U.S. 304, 317 (2002).

[36] *See, e.g., Neal v. State*, 256 S.W.3d 264, 272 (Tex. Cr. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Williams v. State*, 270 S.W.3d 112, 132 (Tex. Cr. App. 2008) ("A defendant, asserting a mental retardation claim in a death penalty case, is entitled to the process of a 'full and fair hearing' to establish this claim.") (quoting *Hall v. Quarterman*, 534 F.3d 365, 371 (5th Cir. 2008)).

[37] 256 S.W.3d, at 272.

approximately ten days before the appellant called the experts to testify. The appellant also argues that the facts and data were "work product and not subject to discovery."

Rule of Evidence 705(a) controls disclosure of facts or data underlying an expert opinion:

> The expert may testify in terms of opinion or inference and give the expert's reasons therefor without prior disclosure of the underlying facts or data, *unless the court requires otherwise.* The expert may in any event disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data. [Emphasis added.]

A trial court is vested generally with broad discretion to conduct a trial.[38] The emphasized clause "unless the court requires otherwise" provides the trial court with specific discretion to require the disclosure of facts or data underlying expert opinions prior to the testimony of the expert.

The record shows that the appellant's defense counsel hired an investigator, Debbie Nathan, to conduct interviews to assemble mitigation evidence. Based on these interviews, Nathan compiled a "mitigation report." When defense counsel decided to pursue a mental-retardation claim, they sent the mitigation report to their mental-retardation experts. The experts used the mitigation report to form their opinions, and the mitigation report was sent to the State's expert pursuant to the trial court order discussed above in Section III-A.

On Wednesday, October 10, the jury heard testimony from several of the appellant's punishment witnesses. The trial court then dismissed the jury for the weekend, reminding the jurors that the trial would break again after the Tuesday of the next week. On Thursday, October 11, the trial court ordered defense counsel to disclose facts or data, including the mitigation report, underlying the opinions of their experts. Defense counsel objected on the grounds that the State should get the mitigation report only "at the time that the witness is on *voir dire* preparing

---

[38] *Sapata v. State*, 574 S.W.2d 770, 771 (Tex. Cr. App. 1978).

to testify in front of the jury." The trial court overruled the defense objection and explained that it

wanted to avoid further delays in the trial:

> [H]ere's the rule. 705 says, "Prior to the expert giving the expert's opinion that the State is entitled to take this person on *voir dire*." It doesn't talk about time frame or anything else like that.

> This case has been delayed, delayed, delayed. I'm not going to run up to October 22nd or 29th now when you plan to call this witness and delay this case any further, because they're going to want a continuance. They will be entitled to a continuance to review the information. They simply will be.

> The data is what it is. And … [Defense Counsel], if you do not create or enhance the substance of information, it ain't work product. So, at this time, I'm ordering the Defense to turn over the disclosure of facts or data underlying your expert's opinion that you will be calling to testify.

On Monday, October 15, the trial resumed. In the afternoon of Tuesday, October 16, the jury was

again excused until Monday, October 29. The State conducted a *voir dire* examination of the

appellant's experts on Wednesday, October 31, and the experts completed their testimony that

day. The trial finally concluded on Thursday, November 1.

As a preliminary matter, the appellant argues on appeal that the mitigation report was

"work product and not subject to discovery." At trial, however, the appellant conceded that the

mitigation report would have to be disclosed; he argued only that he should not be required to

disclose the mitigation report *before* the experts were called to testify. The contention that the

mitigation report was "work product and not subject to discovery" was not argued to the trial

court and is not preserved for review.[39]

The record shows that the trial court ordered the disclosure before the defense experts

were called to testify, but during the presentation of defense witnesses at the punishment phase,

---

[39] R. App. P. 33.1(a).

so that the State could review the information while the jury was excused. The trial court could thereby avoid granting another continuance that would extend the trial further. Under the facts described above, the trial court did not abuse the discretion provided under Rule 705(a). Furthermore, the appellant fails to allege any specific harm arising from the State's possession of the mitigation report prior to *voir dire* of the expert witnesses. Point of error thirty is overruled.

### D. Mental Retardation Finding

In point of error forty-nine, the appellant argues that the jury's answer to the mental-retardation special issue is against the great weight and preponderance of the evidence. In points of error fifty and fifty-one, he argues that the trial court erred in failing to disregard the jury's answer to the mental-retardation special issue and in denying the appellant's motion for judgment notwithstanding the verdict. We will address the latter two points first.

In points of error fifty and fifty-one, the appellant argues that because he introduced expert witnesses to demonstrate mental retardation and the State did not introduce its own expert witnesses in rebuttal, the trial court should have disregarded the jury's answer to the mental-retardation special issue or granted his motion for judgment notwithstanding the verdict.[40] In *Gallo v. State*, we held that when an affirmative defense of mental retardation is asserted at trial, a defendant bears the burden of proof, by a preponderance of the evidence, to establish that he is mentally retarded.[41] We find no authority, however, to support the appellant's contention that

---

[40] To support this assertion, the appellant encourages us to draw an analogy to *Alexander v. Turtur & Associates*, 146 S.W.3d 113 (Tex. 2004). In *Alexander*, the Texas Supreme Court concluded that expert testimony was necessary, under the complex facts of that case, for the plaintiffs to prove the proximate-cause element of a legal malpractice claim. *Id.*, at 120. We find the discussion of the plaintiffs' burden to prove legal malpractice in *Alexander* to have little relevance to the State's rebuttal of mental-retardation evidence in the present case.

[41] 239 S.W.3d 757, 770 (Tex. Cr. App. 2007).

only expert testimony can be used to prove or disprove mental retardation, or that the State had a

burden of production to introduce expert witnesses. In fact, in *Ex parte Briseno*, we cautioned

that "[a]lthough experts may offer insightful opinions on the question of whether a particular

person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of

whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on

excessive punishment is one for the finder of fact, based upon all of the evidence and

determinations of credibility."[42] Points of error fifty and fifty-one are overruled.

We now proceed to point of error forty-nine. As noted above, at trial the appellant bore

the burden of proof, by a preponderance of the evidence, to establish that he is mentally

retarded.[43] This Court defines "mental retardation" according to a three-prong test: (i)

significantly sub-average general intellectual functioning, usually evidenced by an IQ score of

about 70 or below, (ii) accompanied by related limitations in adaptive functioning, and (iii) the

onset of which occurs prior to the age of eighteen.[44] In reviewing the jury's finding that the

---

[42] 135 S.W.3d 1, 9 (Tex. Cr. App. 2004).

[43] *Gallo*, 239 S.W.3d, at 770.

[44] *Briseno*, 135 S.W.3d, at 7-8; *see also Neal*, 256 S.W.2d, at 272-73; *Gallo*, 239 S.W.3d, at 769. Because the adaptive functioning criteria can be "exceedingly subjective," in *Briseno* we also identified several other evidentiary factors which factfinders might also focus upon in weighing evidence of mental retardation:

- Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and, if so, act in accordance with that determination?

- Has the person formulated plans and carried them through or is his conduct impulsive?

- Does his conduct show leadership or does it show that he is led around by others?

- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander

appellant is not mentally retarded, we must consider all of the evidence relevant to the mental-retardation special issue and determine, with great deference to the jury's finding, whether this finding is so against the great weight and preponderance of the evidence as to be manifestly unjust.[45]

### 1. Significantly Sub-Average General Intellectual Functioning

The appellant's evidence on the first prong of the mental retardation test came from two expert witnesses who testified that his IQ scores are consistently below 70. Dr. Antonio Puente, a clinical neuropsychologist and professor of psychology at the University of North Carolina, administered three IQ tests and reported scores of 62, 60, and 48. Dr. Puente gave his opinion that the appellant was mildly mentally retarded. He also noted an IQ test performed by defense expert Dr. Gilbert Martinez that resulted in a score of 69.

Dr. Kristi Compton, a psychologist in private practice in Dallas, administered one IQ test and reported a score of 53. In her opinion, the appellant suffered from mild mental retardation. Dr. Compton further testified that IQ tests have a standard error of measure of plus or minus five points. On cross-examination, Dr. Compton confirmed that Hispanic test subjects historically score 7.5 points lower on IQ tests than Caucasian subjects. She explained, "That doesn't mean they're less intelligent, it has to do with culture and influence." Dr. Compton indicated that there

---

from subject to subject?

- Can the person hide facts or lie effectively in his own or others' interests?

- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

[45] *Gallo*, 239 S.W.3d, at 770.

was no standard protocol for whether to simply add back 7.5 points to the scores of Hispanic subjects. She agreed with the State that if the 7.5 points were added, the appellant's IQ scores would be 55.5, 59.5, 69.5, 67.5, and 76.5. If five additional points were added to reflect the upper limit of the error of measure, the scores would be 60.5, 64.5, 74.5, 72.5, and 79.5.[46] Dr. Compton testified on redirect examination, however, that having multiple scores within the same range gave her additional confidence that the scores were correct and that it would not be proper to simply add 7.5 and 5 points to each score.

The State contends on appeal that three considerations should increase the IQ scores reported by Drs. Puente and Compton. First, "Dr. Compton testified that Spanish speakers tend to score one-half standard deviation below Caucasians, or 7.5 points, because of 'culture and influence,' not cognitive deficiency." Second, the standard error of measurement was plus or minus five points. Third, "case law and the theory of regression to the mean further support interpreting the results, in this case, so that they trend upward to the mean IQ of 100."

The State's contentions have little merit. Whether or not "Spanish speakers" as a group tend to score below "Caucasians" on IQ tests, has little relevance for the proposition that, on the tests administered to him, the appellant's scores were somehow inaccurate due to his particular culture and influences.[47] Furthermore, the State presented no evidence showing why the standard error of measure of five points should be added to the appellant's score rather than subtracted from it or even ignored, particularly in light of the testimony from Dr. Compton that the multiple

---

[46] There appear to be arithmetical errors in this testimony. They do not affect our decision.

[47] *See, e.g., Maldanado v. Thaler*, No. H-07-2984, 2009 WL 3074330 (N.D.Tex. September 24, 2009) (describing expert disagreement about whether a defendant's "cultural differences" artificially lowered his IQ scores).

scores below 70 increased her confidence in the validity of the scores. Finally, the theory of "regression to the mean" was not presented to the jury, and the State does not indicate how that theory would logically apply in this case.

The appellant clearly satisfied the first prong of the mental retardation definition by a preponderance of the evidence.

2. Related Limitations in Adaptive Functioning

To aid our analysis of an appellant's limitations in adaptive functioning, we look to the definition of "adaptive behavior" in the Health and Safety Code.[48] Section 591.003(1) of the Health and Safety Code defines adaptive behavior as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." The appellant was approximately twenty-eight years old at the time of the offense, and because neither party presented evidence or argument concerning the appellant's cultural group, we will consider his cultural group to be simply the people of the State of Texas.

A significant number of witnesses provided testimony relevant to the appellant's adaptive functioning. The testimony of many of the witnesses, however, provided evidence both for and against the appellant's claim. The following is a summary of the more relevant testimony:

- Aleida Reyes Lucio taught the appellant for one year in the sixth grade in Mexico. She described the primitive nature of the appellant's school and testified that the appellant's "learning was very slow" compared to the other children. The school went up to only the sixth grade, and she graduated the appellant from the sixth grade because he was 15 years old, even though the maximum age for a sixth-grade student at that time was between 12 and 13 years of age. During cross-examination, Lucio indicated that her education,

---

[48] *Briseno*, 135 S.W.3d, at 7 n.25. The trial court also used the Health and Safety Code definition in its punishment charge to the jury in the present case.

similar to that of other teachers in small schools, extended only through the ninth grade. She taught the appellant for one year between 1992 and 1993.

- Rosa Maria Rodriguez Rico was a nurse in the region where the appellant was raised. She testified that women in that region often did not have prenatal care and that the appellant's nutrition as a child was "totally deficient." On cross-examination, she conceded that she first met the appellant approximately ten years prior to the trial when he was around the age of 21, and that she treated him for the flu.

- Jessica Baron dated the appellant for five or six months in 2005. She testified that on several occasions the appellant drove to visit her in Wichita Falls. Before the first such trip, she gave the appellant explicit directions from Dallas to her house, but the appellant had to call her several times because he got lost. She also came to visit the appellant in Dallas, where he lived with his uncle and brother. Baron testified that the appellant was shy. When asked a question, "[h]e would answer simply, but that's probably it." She and the appellant would talk almost every night; he had a basic Spanish vocabulary, but she never heard him speak in English. The appellant would always pay for meals when they went out to eat, but she never recalled seeing him count any change after paying. On cross-examination, Baron testified that the appellant did not need directions after his first trip to Wichita Falls. She did not consider him to be slow or mentally retarded, but rather to be shy around crowds. She said, "He was very bright. He didn't have any problems understanding me."

- Alejandra Ruiz Campos is the appellant's mother. She described the appellant's childhood home in Mexico and testified that the appellant left Mexico and came to the United States so that he could send money home. The appellant would typically send money home every 15 days.

- Reyes Lizcano Ruiz is one of the appellant's older brothers. He testified that he and the appellant worked at a community store when the appellant was nine or ten years old. Ruiz did not allow the appellant to continue working at the store because the appellant could not make correct change.

- Deputy Deveesh Amin was a detention officer in the jail where the appellant was held for nearly two years pending trial. Deputy Amin testified that the appellant had behaved well in the administrative custody area of the jail. On cross-examination, Deputy Amin also testified that he had seen a lot of inmates with mental problems or mental illnesses, but from his experience, the appellant did not exhibit any mental issues. The appellant kept a neat and orderly cell and did not have any problems with his hygiene.

- Marta Cruz testified that the appellant could read digital clocks, but not analog ones. Cruz bought the appellant a cell phone and added the line to her plan; the appellant paid for the additional cost of the line, but she had to enter in his contacts and telephone numbers.

Cruz had a VCR that the appellant was unable to operate. The appellant could not understand English-language television and liked to watch a particular Spanish-language children's television show. He lacked certain grooming and hygiene habits such as cleaning his ears and cutting his fingernails. The appellant purchased a used pick-up truck for which he paid too much, in Cruz's opinion. The appellant bought clothes and shoes that were too large for him. In one instance, the appellant wore a plain white blouse belonging to Cruz and did not realize that it was a woman's blouse. On cross-examination, Cruz testified that she never told defense counsel that the appellant was mentally retarded. The appellant called her on several occasions when he had been arrested on DWI or public intoxication charges; he requested that she raise money from his brother and friends to help him bond out "before Immigration got ahold of him."

- Juan Lizcano Aguirre is one of the appellant's cousins. He testified that the appellant was very shy as a child. The appellant also did not seem to understand when someone in the family told a funny story and would occasionally begin laughing when no one else was laughing. He also testified, however, that the appellant was the only one of his four brothers who could be depended on to send money home to his family.

- Mario Alvarez was tasked with training the appellant to perform certain road-construction work for an employer in Houston. He testified that the appellant had trouble placing cones and using a tape measure and saw, and was the only person that he had ever trained who was unable to master these skills. The appellant could do a task when it was explained to him, but he could not retain instructions for more than ten or fifteen minutes. Alvarez occasionally interacted with the appellant socially and testified that the appellant did not always understand jokes and was "almost childish." One of the appellant's cousins, who worked at the same company, helped the appellant figure out how much money to send home. On cross-examination, Alvarez testified that the appellant told him he was leaving Houston for Dallas because he was in love with Marta Cruz. Alvarez and his supervisor asked him not to go because he was doing a good job. At that time the appellant made between $360 and $400 per week.

- Jose Luis Uribi was the appellant's supervisor at a landscaping company in Grand Prarie, Texas. He testified that the appellant would sometimes mow or cut the wrong yard. The appellant was quick to do a job, but was slow to learn things. It was a joke around the company that the appellant could not be sent to mow a yard unless the yards were flagged to indicate which ones to mow. But, he was not slower to learn than other people who came from Mexico. Uribi also testified that the appellant would laugh at appropriate times, and that the appellant knew exactly how many hours he had worked each week and exactly how much he should be paid.

- Jeffrey Gartrell was a detention officer in the jail where the appellant was held pending trial. Gartrell testified that the appellant had caused no problems. On cross-examination, he testified that the appellant maintained his hygiene and an orderly cell. Gartrell had

worked for the sheriff's department for over ten years, and in his experience with thousands of inmates, he did not believe the appellant was mentally retarded. But, Gartrell did not know the definition of mental retardation.

• Mariano Valdivia owned a used-car lot and testified that he sold a used pick-up truck to the appellant and Jose Zarate as co-buyers. Valdivia's records showed that the appellant made weekly payments of $120 from September 2004 to November 2005. Valdivia testified that the appellant would make the payments in person and was usually on time with his weekly payments. Valdivia did not notice anything mentally wrong with the appellant that would prevent Valdivia from selling him the vehicle.

As noted above, "adaptive behavior" was defined for the jury as "the effectiveness with which a person meets standards of personal independence and social responsibility expected of the person's age and cultural group."[49] The jury could consider relevant evidence presented at both the guilt or innocence and the punishment phases of trial, and could also focus on evidence relevant to the factors laid out in *Briseno*.[50]

The evidence relevant to adaptive functioning was extensive, and we need not assign a weight to each piece of evidence. Some of the more significant evidence showing limitations in adaptive functioning was the following: (i) the appellant had trouble following instructions and performing fairly simple tasks in the work environment; (ii) the appellant used limited vocabulary and did not seem to understand humor; (iii) the appellant could not perform certain simple personal tasks such as reading an analog clock, following directions to a location, or operating a VCR; and (iv) the appellant had difficulty learning and socializing. On the other hand, the following evidence suggested that the appellant did not exhibit limitations in adaptive functioning: (i) the appellant maintained continuous employment and was recognized by his

---

[49] TEX. HEALTH & SAFETY CODE § 591.003(1).

[50] 135 S.W.3d, at 8-9.

employers as a hard and reliable worker; (ii) the appellant made regular payments on a vehicle he purchased as a co-buyer; (iii) the appellant maintained romantic relationships with at least two women, neither of whom considered him to be mentally retarded and one of whom considered him to be "bright"; and (iv) the appellant reliably sent significant amounts of money and other items to assist his family.

To prove mental retardation, the appellant had to show by a preponderance of the evidence that he was not effective in meeting standards of personal independence and social responsibility expected of his age and cultural group. On review, we must give great deference to the jury's finding that the appellant was not mentally retarded. Because there was significant evidence admitted that supported the appellant's effectiveness in meeting standards of personal independence and social responsibility, we find that the jury's conclusion that the appellant was not mentally retarded is not so against the great weight and preponderance of the evidence as to be manifestly unjust.[51] Therefore, we need not consider the third prong, onset before the age of eighteen. Point of error forty-nine is overruled.

E. Motion to Open and Close the Argument

In point of error fifty-two, the appellant argues that the trial court erred in denying his motion to open and close the arguments at the punishment phase with respect to the issue of mental retardation. The appellant argues that because he had the burden of proof on the issue of mental retardation, he should have been permitted to offer a rebuttal after the State's argument. The appellant would have us apply Rule 269(a) of the Rules of Civil Procedure, which provides

---

[51] *See, e.g., Gallo*, 239 S.W.3d at 774 (where evidence was both in favor of and against a finding of mental retardation, "the jury was ultimately in the best position to make credibility determinations and evaluate this conflicting evidence").

that "the party having the burden of proof on the whole case, or on all matters which are submitted by the charge, shall be entitled to open and conclude the argument."

Article 36.07 of the Code of Criminal Procedure governs the order of closing arguments in criminal trials: "The order of argument may be regulated by the presiding judge; but the State's counsel shall have the right to make the concluding address to the jury." We dealt with an argument similar to the appellant's in *Martinez v. State*,[52] in which the appellant contended that the civil rules should apply and a defendant should have the right to open and close the argument when only the issue of insanity is raised, because the defendant bears the burden of proof as to that affirmative defense. We found no error in denying the appellant's request to open and close the argument: "Though it may be true that appellant has the burden of proving his affirmative defense, it is still the State's burden to overcome the defendant's evidence and to prove beyond a reasonable doubt all the elements of the offense charged, including the intent and culpability of the defendant."[53]

More recently in *Masterton v. State*, we held that Article 36.07 – not the civil rules – applies to the punishment phase of a capital trial.[54] We stated, "Nothing in the Code of Criminal Procedure limits the application of Article 36.07 to non-capital cases and we see no reason to do so."[55] Masterton claimed trial court error in refusing to give him the concluding argument on the mitigation special issue, but we ultimately found "nothing about the mitigation special issue,

---

[52] 501 S.W.2d 130 (Tex. Cr. App. 1973).

[53] *Id*., at 132.

[54] 155 S.W.3d 167, 175 (Tex. Cr. App. 2005).

[55] *Id*.

which imposes a burden of proof on neither party, that distinguishes appellant's situation from our prior holdings."[56]

Article 36.07 of the Code of Criminal Procedure continues to apply to the punishment phase of capital trials.[57] At the punishment phase, the State bears the ultimate burden of proof required by Article 37.071(c) of the Code of Criminal Procedure to prove future dangerousness beyond a reasonable doubt. The State's statutory right to make the concluding address to the jury at punishment reflects that burden. We find no authority for creating an exception from Article 36.07 when the affirmative defense of mental retardation is raised. Point of error fifty-two is overruled.

## IV. ADMISSIBILITY OF WITNESS TESTIMONY

### A. Wommack

In points of error twenty-five through twenty-seven, the appellant argues that the trial court erred in admitting Officer Mark Wommack's testimony regarding the relative positions of the appellant and the victim. The appellant argues that the trial court erred for three reasons: (i) the testimony was speculative; (ii) Officer Wommack was not qualified as an expert witness to express an opinion concerning the juxtaposition of the appellant and victim; and (iii) the testimony was more prejudicial than probative.

### 1. Trial Record

At trial Officer Wommack testified, without objection, that he is responsible for training all Dallas police officers who carry the AR-15 rifle. He trained Officer Brian Jackson to use the

---

[56] *Id.*

[57] *See, e.g., Luna v. State*, 268 S.W.3d 594, 608 (Tex. Cr. App. 2008), *cert. denied* 130 S. Ct. 72 (2009).

AR-15 rifle and recalled that Officer Jackson exceeded standards in his training. He testified that when standing in a "ready gun position" and observing a threat coming from the side, Officer Jackson was trained to pivot on the foot nearest the threat and square his shoulders and body armor to the threat before firing. He testified further that Officer Jackson was trained to continue firing at a suspect if he was shot by the suspect.

The appellant first objected when the State asked Officer Wommack to consider a hypothetical situation with a mannequin representing Officer Jackson. The appellant stated his objection, "Hypothetical with facts not in evidence." Upon the trial court's request, the State made the following offer of proof:

> I anticipate with the hypothetical having the mannequin positioned – placed like we've done with other witnesses in relation to the light that was in here earlier. And other witnesses indicating where the suspect was found when he was lying in the yard, the approximate distance. And the other evidence being the photograph that depicts Officer Jackson's rifle defects in the chair that was on the porch and the two in the house next door. And I'm going to present a hypothetical to him, if the officer is struck, as the evidence will show, through the right arm or through-and-through and across the body and with a defect in a chair being here (indicating), the target being there (indicating), and a couple of defects behind that target, his opinion, based on his training and experience of whether or not Officer Jackson was able to get that suspect in sight or what his position would have been in relation to him being shot based on that training and experience.

After the State's offer, the appellant renewed his objection:

> [W]e don't have any … firm evidence as to where the officer was standing and how he was standing. And we don't have any evidence at all as to where the defendant was standing, because only people can testify that that corner was dark, and by the time they got there many seconds later he was on the ground with his hands over his head. So there's no evidence where the defendant was when this event occurred, or how he was standing, or what position he was in. Nor is there any evidence as to where the officer was standing, or what position he was in at the time of the shooting. And this is speculation. I'm sure the State would love to be able to prove this through this witness, but without the facts in evidence, it's an improper hypothetical.

The appellant further objected that "[t]here's no predicate under the 705 hearing that that meets the tests of Daubert or Kelley or anything." The trial court permitted the appellant to conduct the following *voir dire* examination:

[DEFENSE COUNSEL]: What training have you received in crime scene investigation?

[WOMMACK]: Actually I was a crime scene investigator through part of the early years in my deployment time. I didn't do it as a full-time job, but I've had fingerprints, photo, some reconstruction, but not much.

[DEFENSE COUNSEL] And when was that?

[WOMMACK]: It was a long time ago. I hired on in '72, and it was somewhere around '75.

…

[DEFENSE COUNSEL]: Fair enough. And what training do you have in crime scene re-enactment?

[WOMMACK]: Nothing certified, ma'am.

[DEFENSE COUNSEL]: Okay. Have you been to the scene of this incident?

…

[WOMMACK]: No, ma'am.

[DEFENSE COUNSEL]: Is there anything else that you can give us, like some study or some kind of proof that this is an accepted method … of determining where people were standing when an event occurred? Do you have the documentation for that?

[WOMMACK]: In relationship to how he was shot?

[DEFENSE COUNSEL]: Uh-huh -- yes, sir.

[WOMMACK]: Just years of going to calls and studying gun fights.

The appellant renewed his objection on the basis that Officer Wommack's crime-scene

investigation training was outdated and that he had not been to the scene. The appellant also objected under Rule 403, arguing that any opinion given by Officer Wommack would have low probative value that would be outweighed by danger of undue prejudice. Finally, the appellant objected that the testimony would be "speculation on his part as to what the state of mind of people were at that point and that evening."

After the appellant's objections were overruled, Officer Wommack ultimately testified that in his opinion, based on Officer Jackson's training, the trajectory of the appellant's bullet, and the spray of bullets from Officer Jackson's AR-15, Officer Jackson was shot as he faced away from the appellant and before he had the opportunity to see the appellant, pivot to face him, and commence firing.

### 2. Analysis

On appeal, the appellant does not present any argument whatsoever with respect to his points of error on speculation and Rule 403. Rule of Appellate Procedure 38.1(h) requires that the appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Points of error twenty-five and twenty-seven are therefore overruled.

We turn now to point of error twenty-six. While the appellant cited Rule 705 at trial, it appears from the substance of his objection at trial and his argument on appeal that the appellant objects to the qualification of Officer Wommack as an expert witness under Rule of Evidence 702. In general, witnesses must testify to matters of which they have personal knowledge.[58] At common law, witnesses were prohibited from expressing opinions, even when based upon facts

---

[58] TEX. R. EVID. 602.

within the witnesses' personal knowledge.[59] Rule 701 relaxed this common law prohibition: "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact at issue." Expert witnesses are permitted wider latitude to offer opinions under Rule 702.[60] "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."[61]

We need not reach Rule 702, however. We may affirm the trial court's ruling if it is correct on any theory of law applicable to the case and supported by the record.[62] This principle holds true even when the trial judge gives the wrong reason for his decision, and is especially true with regard to admission of evidence.[63] Officer Wommack's testimony was admissible as the opinion of a lay witness under Rule 701. Officer Wommack testified to his personal knowledge of the training of Officer Jackson, specifically that Officer Jackson was trained to pivot and square his shoulders to a threat perceived from the side. The State then gave Officer Wommack the hypothetical assumption that the defendant approached Officer Jackson from the side, and that the defendant's shot entered Officer Jackson from the side and through his arm and armpit.

---

[59] 2 STEVEN GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 701.2 .

[60] *See id*., at § 702.2.

[61] R. EVID. 702.

[62] *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Cr. App. 1990).

[63] *Id*.

Officer Wommack testified that, in his opinion, Officer Jackson did not see the threat, because if he had seen the threat, he would have pivoted according to his training.

Officer Wommack's opinion was rationally based on his perceptions; that is, a reasonable juror could draw the opinion that Officer Jackson did not see the appellant from the facts of Officer Jackson's training and the trajectory of the bullet into the side of his body. Furthermore, the fact at issue was whether the appellant fired before Officer Jackson saw him, and ultimately whether the appellant acted in self-defense. Officer Wommack's opinion was helpful to the jury in connecting his testimony about Officer Jackson's training to the determination that the appellant fired first. The testimony was therefore admissible as a lay opinion under Rule 701. Point of error twenty-six is overruled.

## B. Compton, Wimbish, and Cruz

In points of error thirty-one through thirty-three, the appellant argues that the trial court erred in sustaining the State's objection to testimony from Dr. Kristi Compton, Dr. Gary Wimbish, and Marta Cruz regarding diminished capacity. The appellant argues that because of mental disease or paranoid delusions, the appellant did not know that he was shooting at a police officer.

Texas does not recognize diminished capacity as an affirmative defense.[64] The Texas Legislature has not enacted any affirmative defenses, other than insanity, based on mental disease, defect, or abnormality. Thus, they do not exist in Texas.[65] Instead, there is a presumption

---

[64] *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Cr. App. 2005).

[65] *Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Cr. App. 2008).

under Texas law that a criminal defendant intends the natural consequences of his acts.[66] As with

other elements of an offense, relevant evidence may be presented that a jury may consider to

negate any *mens rea* elements.[67] This evidence may include evidence of a defendant's history of

mental illness,[68] or evidence of a defendant's physical or mental diseases or defects.[69] But the

evidence still must meet generally applicable requirements for admission of evidence, such as

Rules of Evidence 402 and 403,[70] and may be excluded if it does not truly negate the *mens rea*.[71]

During the trial, the appellant called Dr. Kristi Compton as an expert witness to testify

regarding IQ tests taken by the appellant. During the State's *voir dire* examination of Dr.

Compton, defense counsel made an offer of proof that the witness would testify that the appellant

had "limited cognitive ability," which was relevant to *mens rea*:

> [W]e are trying to establish that the defendant is less than normal … in his
> understanding and comprehension of events that occur around him. It is an
> attempt to rebut evidence of *mens rea*…. The State has put forth evidence that he
> intended and knew what he was doing, and I think that his cognitive disabilities
> are relevant and should be provided to the jury so that they can … know about
> them in making a decision about how his mind worked that night.

The trial court asked, "[A]re you going to offer any direct evidence of examinations that the

---

[66] *Id.*, at 591 (citing *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Cr. App. 2005)).

[67] *Jackson*, 160 S.W.3d, at 574.

[68] *Id.*

[69] *Ruffin*, 270 S.W.3d, at 593.

[70] *See Jackson*, 160 S.W.3d, at 574; *Ruffin*, 270 S.W.3d, at 595-96. Rule 402 provides that evidence which is not relevant is inadmissible. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

[71] *Ruffin*, 270 S.W.3d, at 596.

defendant in this case did not have … the *mens rea*?" Defense counsel conceded that there was no such evidence: "No, Your Honor, … she could not say that. All she can offer is that this man functions at a low level of cognitive disability [*sic*]."

The appellant called Dr. Gary Wimbish to testify about the approximate level of alcohol in the appellant's blood at the time of the offense. During the State's *voir dire* examination, Dr. Wimbish testified that he would give the opinion that the appellant consumed between two and five drinks on the day of the offense, but that he could not render an opinion about whether the appellant was intoxicated.

Marta Cruz's testimony was discussed above. During cross-examination at the guilt phase, defense counsel asked Cruz if, during the course of her relationship with the appellant, she helped him "with certain things" or assisted him "in making orders and things at the jail." The State objected to relevance, and the trial court sustained the objection. When Cruz testified at the punishment phase, defense counsel said that Cruz's testimony at the punishment phase "is what we would have put on had we … been allowed to in guilt and innocence."

Because the evidence from these witnesses does not negate any *mens rea* element, the trial court did not err in excluding the evidence at the guilt or innocence phase. Our analysis in *Ruffin v. State* provides a good contrast by illustrating when evidence of mental illness would be admissible. Ruffin was charged with aggravated assault after shooting at police officers whom he believed were "trespassers" and "Muslims," but not police officers. We held that the testimony of a psychologist was relevant and admissible to rebut the *mens rea* element of the offense; the psychologist testified that Ruffin suffered from delusions, and that in the psychologist's opinion, Ruffin was suffering during the offense from psychotic symptoms such as hearing and seeing

things that did not exist.[72]

In the present case, the appellant argues that the excluded testimony was relevant to "whether, because of mental disease or delusion he believed he was not shooting at a uniformed police officer." He argues further that "when and how paranoid delusions may distort a person's auditory and visual perceptions is admissible as it relates to whether Appellant intended to shoot a police officer." But, there is no suggestion in the trial record that the excluded testimony had anything to do with delusions. Instead, the excluded testimony suggested general limitations in cognitive ability, intoxication at the time of the offense, and general deficits in adaptive functioning. The excluded testimony had relevance only to whether the appellant's mental functioning was below normal to some degree. There was no evidence showing a connection between the appellant's generally low level of mental functioning and his knowledge during the commission of the offense that the victim was a police officer.[73] The trial court therefore did not abuse its discretion in excluding the evidence.[74] Points of error thirty-one through thirty-three are overruled.

## C. Daulat

In point of error thirty-four, the appellant argues that the trial court erred in sustaining the

---

[72] *Id.*, at 590.

[73] *See United States v. Cameron*, 907 F.2d 1051, 1067-68 (11th Cir. 1990) (psychiatric evidence to negate specific intent is admissible when it focuses on the appellant's specific state of mind at the time of the offense, but the appellant failed to demonstrate how her psychiatric evidence of schizophrenia would negate intent to distribute crack cocaine); *Ruffin*, 270 S.W.3d at 596 n.32 (citing *Cameron*).

[74] While the trial court ruled that the testimony of Dr. Wimbish was not admissible under Rule 403, we note that the testimony was likely also inadmissible under Section 8.04(a) of the Penal Code, which provides, "Voluntary intoxication does not constitute a defense to the commission of a crime." *See Sakil v. State*, 287 S.W.3d 23, 28 (Tex. Cr. App. 2009) ("Evidence of an appellant's intoxication, if any, does not negate the elements of intent or knowledge.") (quoting *Hawkins v. State*, 605 S.W.2d 586, 589 (Tex. Cr. App. 1980)).

State's objection to photographs and accompanying testimony offered to prove that he suffered broken ribs at or near the time of the arrest, and thereby to impeach police officers who testified that they did not assault the appellant during his arrest. The appellant argues that he was also "denied the opportunity to possibly create sympathy for the defendant because he was severely beaten by officers."

During the trial, the appellant attempted to show that police officers assaulted him during his arrest. On cross-examination, several of the testifying officers denied assaulting the appellant. The appellant then introduced evidence suggesting that the officers had assaulted him, including testimony from a neighbor and DNA evidence that a bloodstain on the exterior of the neighbor's house matched the appellant's DNA profile.

The appellant also sought to introduce X-ray images and testimony from Dr. Veena Daulat. Dr. Daulat examined X-rays of the appellant's ribs taken on August 17, 2007. On *voir dire*, Dr. Daulat testified that the X-rays showed a "remote left seventh rib fracture." She further testified that "remote" simply meant that the fracture did not occur on the day of examination or the day prior: "Remote means it's old. It could be a few days old, it could be a few years old…. [I]t looked old because it didn't have a lucent line to say that it was done today or yesterday." In fact, the rib fracture could have occurred five, ten, or fifteen years prior to the examination.

The State objected that Dr. Daulat's testimony was not relevant because she could only testify that the appellant had a "remote" rib fracture. The trial court ruled that the evidence was not admissible: "The Court is … not inclined to let the doctor testify about … an injury that she knows nothing about and can't pinpoint it. We don't know when the rib was … broken."

The trial court did not abuse its discretion in ruling that Dr. Daulat's testimony was not

relevant. There was no evidence connecting the appellant's "remote" rib fracture to the alleged

assault by officers at the time of the appellant's arrest, nearly two years before X-rays were taken.

That the appellant sustained a rib fracture at some time in his life did not tend to make more

probable the theory that the appellant was assaulted by officers on November 14, 2005.[75] Point of

error thirty-four is overruled.

D. Wilcox

In point of error thirty-five, the appellant argues that the trial court erred in denying his

objection to the testimony of Officer Robert Wilcox. The entirety of the appellant's point of error

is reproduced below:

> Appellant respectfully directs this Honorable Court's attention to Reporter's
> Record Volume 48 pages 123-154 at which the trial court allowed the State to
> question Officer Robert Wilcox concerning the initiation of questioning of
> Appellant about an extraneous offense of driving while intoxicated. The State
> sought to have Officer Wilcox testify about his initial conversation with Appellant
> through a translator concerning whether Appellant had any medical or mental
> disability that would present him from performing field sobriety tests contrary to
> Art. 38.22 C.C.P. and objection to hearsay evidence from the translator.
> (RR48:135-137). The Court overruled Appellant's objection. See *Miffleton v.
> State*, 777 S.W.2d 76 (Tex. Crim. App. 1989) for support of issue that no audio
> conversation between officer and suspect is admissible. Additionally, the trial
> court allowed the State to violate Appellant's fifth amendment of U.S.
> Constitution right to remain silent by allowing such testimony. Appellant is
> entitled to a new trial based on this constitutional error that denied him a fair trial.

None of the issues raised in this multifarious point of error is adequately briefed. Rule of

Appellate Procedure 38.1(i) requires a "clear and concise argument for the contentions made,

with appropriate citations to authorities and to the record." To be adequately briefed, a point of

---

[75] TEX. R. EVID. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

error must cite relevant legal authority and provide legal argument based upon that authority.[76] The appellant fails to show how *Miffleton v. State* is relevant to any of his potential claims,[77] and provides no argument based on that authority.[78] Point of error thirty-five is overruled.

## V. CONTINUANCES

In point of error twenty-eight, the appellant argues that the trial court erred in denying his oral motion for continuance in order to obtain the presence of a defense expert. The appellant acknowledges our clear rule that an oral motion for continuance preserves nothing for review,[79] but urges us to reconsider because several Texas Courts of Appeals have found an "equitable" or "due process" exception to this rule. We decline to find such an exception.[80]  The record reflects that the appellant's oral motion for continuance, which was subsequent to several earlier motions for continuance, was made late in the afternoon of Wednesday, October 31, 2007. The parties and the trial court had discussed potential scheduling conflicts with this defense expert on the previous day. There is no question that the appellant had the time to properly present a written, sworn motion for continuance compliant with the requirements of Articles 29.03, 29.07, and

---

[76] *See Busby v. State*, 253 S.W.3d 661, 673 (Tex. Cr. App. 2008), *cert. denied* 129 S. Ct. 625 (2008) ("This Court has no obligation to construct and compose appellant's issues, facts, and arguments with appropriate citations to authorities and to the record.") (internal quotations omitted); GEORGE E. DIX & ROBERT O. DAWSON, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 43.404 ("A point of error may be disregarded or overruled or dismissed as inadequately briefed if it is supported by neither citation to authority nor argument in the brief.").

[77] 777 S.W.2d 76, 81 (Tex. Cr. App. 1989) (audio portion of a tape should have been suppressed at trial to the extent that it contained compelled testimony given in response to custodial interrogation).

[78] *See, e.g., Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Cr. App. 1996) (point of error was inadequately briefed where appellant "simply declares that his right to counsel was violated, and presents no argument or authority for this contention"); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Cr. App. 2000) (point of error was inadequately briefed where appellant failed to explain how cited authorities supported appellant's argument).

[79] *Dewberry v. State*, 4 S.W.3d 735, 755 (Tex. Cr. App. 1999); *Anderson v. State*, No. PD 1441-08, 2009 WL 3837335, *3 (Tex. Cr. App. November 18, 2009).

[80] *Anderson*, at *3.

29.08 of the Code of Criminal Procedure. Point of error twenty-eight is overruled.

In points of error twenty-nine and forty-six,[81] the appellant argues that a week-and-a-half recess during the defense presentation of punishment evidence violated his due process rights under the Fourteenth Amendment of the United States Constitution because it interfered with his right to present evidence in his favor in an effective and consistent manner. The record reflects that the trial court excused the jury on the afternoon of Tuesday, October 16, 2007, following an off-the-record bench conference with the parties. The trial court admonished the jurors not to deliberate, research, or talk about the case, and concluded, "and those of you going on vacation, please enjoy it. We are envious." It is not clear from the record why the trial court recessed the trial, or whether the parties expressly agreed to the recess. But, it is clear that the appellant was aware of the upcoming recess at least as early as Thursday, October 11, 2007, and did not object on the record at any time.

In the context of a trial-recess point of error, we stated in *Johnson v. State*, "A trial judge necessarily has broad discretion to deal with the many unexpected situations which arise during trial."[82] Our review of the record does not reveal an abuse of the trial court's discretion. Not only has the appellant failed to show how these points of error are preserved for review, but he has failed to cite any authority involving recesses found to be an abuse of the trial court's discretion, or supporting his contention that the trial court's action was error because "[p]rocedural [due] process provides that the defense … be allowed to put on a continuous and logical presentation

---

[81] While phrased in a slightly different manner, points of error twenty-nine and forty-six appear to contain identical claims. Point of error forty-six also mentions the Equal Protection Clause of the United States Constitution, but presents no argument for how it may apply.

[82] *Johnson v. State*, 583 S.W.2d 399, 405 (Tex. Cr. App. 1979) (citing *Sapata*, 574 S.W.2d, at 771 (Tex. Cr. App. 1978) ("The trial court is necessarily vested with broad discretion to conduct a trial.")).

of evidence." Points of error twenty-nine and forty-six are overruled.

## VI.  MOTION FOR NEW TRIAL

In point of error forty-seven, the appellant argues that the trial court erred in denying his request for an evidentiary hearing on his Motion for New Trial. In point of error forty-eight, the appellant argues that the trial court erred in denying his Motion for New Trial.

On November 30, 2007, the appellant filed a Motion for New Trial pursuant to Rule of Appellate Procedure 21. The motion contained the following grounds for a new trial: (i) the evidence was legally and factually insufficient to support the jury's verdict on each of the special issues; (ii) consideration of mental retardation during the punishment phase was unconstitutional; (iii) the delay in trial during the defense presentation of punishment evidence denied the appellant a fair trial; (iv) the delays during punishment while the trial court simultaneously administered another case denied the appellant a fair trial; (v) the requirement that the defense disclose underlying evidence that would form the basis of expert witness opinions gave the State an unfair advantage; and (vi) the denial of a continuance to secure the testimony of Dr. Martinez prejudiced the appellant's defensive strategy.

On January 3, 2008, the trial court held a hearing on the Motion for New Trial. Because the appellant had already been transported to the custody of the Texas Department of Criminal Justice, the trial court decided not to take live testimony, but rather to consider sworn affidavits from defense counsel as evidence in support of the motion. The trial court explained that it "[did] not see any evidence in the affidavits that would require any live testimony, and the Court is of the opinion the Court can … make a ruling on that motion based solely on the affidavits, which were incorporated into the record and are evidence."

Rule of Appellate Procedure 21.7 provides a trial court with discretion in considering a motion for new trial: "The court may receive evidence by affidavit or otherwise." A trial court may rule based on sworn pleadings and affidavits without oral testimony. Live testimony is not required.[83] A trial court abuses its discretion in failing to hold a hearing only when a defendant presents a motion for new trial raising matters not determinable from the record.[84] From our review of the record, we agree with the trial court that the matters raised by the appellant in his Motion for New Trial could be adequately determined from the record and the affidavits of defense counsel. Point of error forty-seven is overruled.

In point of error forty-eight, we review the trial court's denial of the Motion for New Trial under an abuse-of-discretion standard.[85] We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable. A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling.[86]

Each of the matters raised in the Motion for New Trial has been raised again as a point of error on appeal. Based on our review of the record and the arguments of the parties, we have affirmed the trial court's ruling on the merits of each matter with the exception of the sixth, the denial of a continuance to secure the testimony of Dr. Martinez. With respect to this matter, a reasonable view of the record supports the trial court's reasoning that the testimony of Dr.

---

[83] *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Cr. App. 2006).

[84] *Id.*

[85] *Id.*

[86] *Id.*

Martinez would have been substantially similar to the two other mental-retardation experts that were introduced by the appellant, and Dr. Martinez had been available to testify at other times during the defense presentation of evidence. We therefore find that the trial court's decision was not arbitrary or unreasonable, and the trial court did not abuse its discretion in denying the appellant's Motion for New Trial. Point of error forty-eight is overruled.

## VII. JURY CHARGE

### A. Guilt Phase

In points of error thirty-six through thirty-eight, the appellant argues that the trial court erred in denying his requests for jury charges on the lesser-included offenses of manslaughter and negligent homicide, and the justification of self-defense.

#### 1. Manslaughter and Negligent Homicide

The appellant argues that a charge on manslaughter was warranted because the appellant was highly intoxicated and acting recklessly, and "[t]he events that occurred when the Defendant … encountered Officer Jackson … happened very fast." In addition, the appellant "submits that he felt in his mind that he was being confronted by an armed person when he recklessly pointed the gun toward the deceased and fired once." The appellant argues that a charge on negligent homicide was warranted because "Appellant acted negligently and should have been aware of a substantial and unjustified risk that the circumstances exist or the result would occur when he fired his gun once upon the excited, highly emotional encounter where the police were chasing him."

We use a two-step test to determine whether an appellant was entitled to a jury charge on

a lesser-included offense.[87] First, we determine if the offense requested was a lesser-included

offense of the offense charged. Article 37.09 of the Code of Criminal Procedure defines a lesser-

included offense:

> An offense is a lesser included offense if:
>
> (1) it is established by commission of the same or less than all the facts required to establish the commission of the offense charged;[88]
>
> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
>
> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
>
> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

Second, we determine if there is some evidence in the record that would permit a jury rationally

to find that if the appellant is guilty, he is guilty only of the lesser-included offense.[89] We

consider the evidence produced by both parties, but the credibility of the evidence and whether it

conflicts with, or is controverted by, other evidence is not considered.[90]

The indictment alleged the offense of capital murder with the following elements:

(i) the appellant;

---

[87] *Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex. Cr. App. 1993).

[88] To determine whether a lesser included offense is "established by commission of the same or less than all the facts required to establish the commission of the offense charged," we must compare the elements of the offense as alleged in the indictment with the elements of the potential lesser included offense. *Hall v. State*, 225 S.W.3d 524, 535-36 (Tex. Cr. App. 2007).

[89] *Rousseau*, 855 S.W.2d at 673; *Royster v. State*, 622 S.W.2d 442 (Tex. Cr. App. 1981).

[90] *Smith*, 297 S.W.3d at 274-75; *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Cr. App. 1994).

(ii) intentionally and knowingly;

(iii) caused the death of Brian Jackson, an individual, by shooting him with a firearm; and

(iv) Brian Jackson was a City of Dallas police officer acting in lawful discharge of an official duty; and

(v) the appellant knew that Brian Jackson was a police officer.

The offense of manslaughter is defined in Section 19.04 of the Penal Code: "A person commits an offense if he recklessly causes the death of an individual." The offense of negligent homicide is defined in Section 19.05: "A person commits an offense if he causes the death of an individual by criminal negligence." Because manslaughter and negligent homicide could have been established by commission of the same or less than all the facts required to establish the offense of capital murder as alleged in the indictment, manslaughter and negligent homicide are lesser-included offenses.

While he meets the first prong, the appellant does not meet the second prong of the test because there was no evidence that he negligently or recklessly, but not intentionally or knowingly, caused the death of Officer Jackson. Whatever the appellant now "submits that he felt in his mind," evidence of his internal thoughts was not presented to the jury at the trial. Furthermore, because voluntary intoxication does not constitute a defense to the commission of a crime,[91] the appellant's evidence of voluntary intoxication would not permit a rational jury to find that the appellant was guilty of manslaughter or negligent homicide, but was not guilty of capital murder. Finally, there is no evidence in the record that the appellant came upon Officer Jackson too suddenly to be able to form an intentional or knowing mental state with respect to

---

[91] TEX. PEN. CODE § 8.04(a).

his conduct in shooting the officer. Points of error thirty-six and thirty-seven are overruled.

## 2. Self-Defense

In point of error thirty-eight, the appellant argues that the trial court erred in denying his request for a jury charge on self-defense. He argues that in his "intoxicated and paranoid state of mind at the time of the offense, he was acting in self defense." Further, he argues that there is no evidence that Officer Jackson identified himself as a police officer or ordered the appellant to throw down his weapon. On the other hand, there was evidence that he surrendered after Officer Jackson fell, and the arresting officers beat the appellant after his arrest.

The issue of self-defense is not submitted to the jury unless evidence is admitted supporting the defense.[92] In *Shaw v. State*, we stated that a defense is supported by the evidence if "there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true."[93] If a defense is so supported, "the defendant is entitled to an instruction on that defense, even if the evidence supporting the defense is weak or contradicted, and even if the trial court is of the opinion that the evidence is not credible."[94] Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law.[95]

Section 9.31(a) of the Penal Code establishes the elements of self-defense. "Except as provided in Subsection (b), a person is justified in using force against another when and to the

---

[92] *Id.*, at § 2.03(c).

[93] 243 S.W.3d 647, 657 (Tex. Cr. App. 2007).

[94] *Id.*, at 658.

[95] *Id.*

degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."[96] Subsection (b) then establishes certain exceptions, including that "the use of force against another is not justified … to resist an arrest or search that the actor knows is being made by a peace officer … even though the arrest or search is unlawful, unless the resistance is justified under Subsection (c)." Subsection (c) provides:

> The use of force to resist an arrest or search is justified (1) if, before the actor offers any resistance, the peace officer … uses or attempts to use greater force than necessary to make the arrest or search; and (2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's … use or attempted use of greater force than necessary.[97]

Here, it is undisputed that the appellant fired several shots at police officers as they searched for him behind Cruz's house. As the appellant ran around to the front of the house, the appellant fired one shot and Officer Jackson fired three shots. The evidence presented at trial was consistent with the appellant's revolver firing first, followed by Officer Jackson's rifle firing second.

The appellant failed to introduce evidence supporting each of the elements of self-defense. The appellant has failed to introduce evidence that, before the appellant offered any resistance, Officer Jackson used or attempted to use greater force than necessary to make the arrest. Furthermore, the appellant has failed to introduce evidence that the appellant reasonably

---

[96] TEX. PEN. CODE § 9.31(a).

[97] Additional elements must be met to use the justification of Deadly Force in Defense of Person, as would be necessary to justify the appellant's conduct in this case. Because we find that the appellant has not introduced evidence to support each element of Self-Defense, we need not proceed to consider Deadly Force in Defense of Person.

believed that force was immediately necessary to protect himself when no officer had returned

the appellant's fire until after he shot Officer Jackson. Because the appellant did not submit

evidence to support a rational jury finding on each element of self-defense, the trial court did not

err in denying the requested jury charge.[98] Point of error thirty-eight is overruled.

## VIII.  PUNISHMENT PHASE

### A. Victim-Impact Testimony

In points of error forty-one through forty-five, the appellant argues that the trial court

erred in overruling his objections to the testimony of several State witnesses as improper victim-

impact testimony. In *Mosley v. State*,[99] we established that victim-impact and victim-character

evidence are admissible at the punishment phase of trial with certain limitations:

> Both victim impact and victim character evidence are admissible, in the context of
> the mitigation special issue, to show the uniqueness of the victim, the harm caused
> by the defendant, and as rebuttal to the defendant's mitigating evidence. Rule 403
> limits the admissibility of such evidence when the evidence predominantly
> encourages comparisons based upon the greater or lesser worth or morality of the
> victim.[100]

### 1.  Foster

In point of error forty-one, the appellant argues that the trial court erred in admitting

testimony of Officer Anthony Wayne Foster.[101] Officer Foster testified that he came into contact

---

[98] *See Lockhart v. State*, 857 S.W.2d 568, 574-75 (Tex. Cr. App. 1992) (finding that evidence did not sufficiently raise self-defense where the appellant initiated the altercation that resulted in a police officer's death, there was no evidence that the appellant attempted to abandon the encounter, the officer did not use excessive force, and the appellant's resistance was unreasonable).

[99] 983 S.W.2d 249 (Tex. Cr. App. 1998).

[100] *Id.*, at 262.

[101] While both the appellant and the State ascribe the testimony at issue to Officer Wilcox, it is actually the testimony of Officer Foster that is cited and discussed.

with the appellant approximately two months before the instant offense. Officer Foster was waiting in the "book-in line" at the Dallas County Jail with an individual whom Officer Foster had just arrested; Officer Robert Wilcox was waiting in the line with the appellant, whom he had just arrested for DWI. The appellant was screaming profanities and threatening to kill Officer Wilcox. Officer Wilcox asked Officer Foster if he should file a retaliation charge against the appellant, but Officer Foster recommended against filing the charge. A few days after Officer Foster learned of the death of Officer Jackson, he learned that the appellant had been arrested for the crime.

The State asked Officer Foster, "Now, Officer, do you wish now to this day you would've filed a retal–." The State's question was interrupted by a relevance objection from the appellant. The trial court sustained the objection. On cross-examination, the appellant nonetheless asked the officer about the retaliation charge:

> [DEFENSE COUNSEL]: Okay. And, of course, no retaliation case was filed, was there?
>
> [FOSTER]: No.
>
> [DEFENSE COUNSEL]: You talked about it and didn't take it serious and didn't file it.

On redirect, the State again asked Officer Foster about the retaliation charge:

> [STATE]: Officer, you wish you'd filed that charge?
>
> [DEFENSE COUNSEL]: Again, Your Honor, I object. It's irrelevant.
>
> THE COURT: Overruled. I think it was a close call before, and I think the door's been opened by … your line of questioning. You can answer … the question.
>
> [FOSTER]: Yes, I do. I'm going to think about it for the rest of my career.

[DEFENSE COUNSEL]: Your Honor, I object. That's victim impact statement right there.

THE COURT: Overruled.

The appellant simply characterizes Officer Foster's response – "I'm going to think about it for the rest of my career" – as victim-impact evidence, without any further discussion.[102] Even assuming such characterization is proper, the appellant himself "opened the door" to the testimony. In addition, the appellant has failed to explain why such victim-impact evidence would be inadmissible. As we said in *Mosely*, victim-impact evidence is admissible so long as it complies with the rules of evidence and does not encourage comparisons based on the greater or lesser worth of the victim. The appellant fails to explain how Officer Foster's testimony regarding the effect of Officer Jackson's death violates the limitations of *Mosely* or the rules of evidence. Point of error forty-one is overruled.

### 2. Jackson, Irizarry, Kramer, and Huerta

In points of error forty-two through forty-five, the appellant argues that the trial court erred in overruling his objection to the testimony of four State witnesses (Jackson, Irizarry, Kramer, and Huerta, respectively) as victim-impact testimony with a prejudicial effect that outweighed any probative value. The appellant argues that their testimony "makes a comparative worth analysis of the value of the victim to their families and the community compared to the defendant or other members of society." But the appellant failed to preserve any error for review.

For the alleged errors to be preserved for our review, Rule of Appellate Procedure 33.1

---

[102] The State argues that the testimony supports future dangerousness by reflecting "the fear [Officer Wilcox] felt as a victim of appellant's threats to kill him." The State again appears to confuse the two officers. But, the testimony may support future dangerousness by showing that Officer Foster did take the appellant's threats seriously, contrary to the suggestion of defense counsel.

requires that the record must show that the appellant made a timely, specific objection to the trial court, and the trial court ruled on the objection, or refused to rule on the objection, and that the appellant objected to the refusal.[103] Before the witnesses were called, the appellant stated that he "anticipate[d] that the next witnesses will be giving victim impact testimony." He objected under the Eighth Amendment, arguing that "there is a danger that the admission of this … victim impact statement creates a constitutionally uncontestable risk that the jury might impose the death penalty in an arbitrary and capricious manner," and also objected under Rules of Evidence 401, 402, and 403. The trial court overruled the constitutional objection, citing *Mosely*. The trial court refused to make a finding with respect to the evidentiary objection, reasoning, "I can't balance anything until I've heard it."

Gina Jackson was the first of the four witnesses to testify. Ms. Jackson is the victim's older sister. She described hearing the news of her brother's death, traveling to Dallas, and meeting her brother's friends upon her arrival. She further described the memorial services, the close relationship she had with her brother, and the negative impact that her brother's death continued to have on her life. At the conclusion of her testimony, the State asked the following question: "Ms. Jackson, if you would, tell the jury, again, through your eyes as Brian's sister the type of person, the character you saw when you think of your younger brother. Just help them understand a little bit about the character." The appellant objected and asked the trial court "to do a 401, 402, and 403 analysis to this type of evidence." The trial court overruled the objection, but the State withdrew the question and called its next witness.

After Ms. Jackson's testimony, Officer Melquiades Irizarry testified that she arrested the

---

[103] *See also* TEX. R. EVID. 103(a).

appellant for public intoxication on June 6, 2004. Officer Brandi Kramer then testified that she encountered the appellant in an intoxicated state on December 25, 2004, and that she would have arrested him for public intoxication, but a relative appeared at the scene and took responsibility for him. Finally, David Huerta, a neighbor of Marta Cruz, testified about a "scuffle" at Cruz's house in September 2005. The appellant made no objections during the testimony of these three witnesses.

The appellant's preliminary objection that unidentified "next witnesses" would be presenting victim-impact testimony was not sufficiently specific to preserve error for review. In addition, the trial court never ruled on the objection that the testimony was inadmissible under Rules 402 and 403, and the appellant failed to object to its refusal to rule. We also note that only Gina Jackson actually gave victim-impact testimony. Her testimony was not only well within the limitations established by *Mosely*, but the State withdrew the only question specifically objected to by the appellant. Points of error forty-two through forty-five are overruled.

## B. Review of Future Dangerousness

Pursuant to Article 37.071 of the Code of Criminal Procedure, the trial court submitted a future-dangerousness special issue to the jury at the conclusion of the punishment phase. In point of error fifty-three, the appellant argues that the evidence was legally insufficient to support the jury's affirmative answer because (i) the appellant had no prior violent background, (ii) defense experts testified that the appellant was a low risk for future dangerousness, but the State did not introduce expert testimony in rebuttal, and (iii) there was no evidence of premeditation.

Article 44.251 of the Code of Criminal Procedure requires this Court to reform a sentence of death to a sentence of confinement for life without parole if we find that there is legally

insufficient evidence to support the jury's affirmative answer. In reviewing a legal insufficiency claim, we view the evidence in the light most favorable to the jury's finding and then determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society.[104] In other words, if a rational juror necessarily would have entertained a reasonable doubt as to the probability of appellant's dangerousness, we must reform the trial court's judgment to reflect a sentence of life imprisonment.[105]

During the punishment phase of trial, the State attempted to prove the probability of the appellant's future dangerousness by introducing evidence of his criminal record and his propensity for violence against police officers. Lieutenant Richard Rivas, Sergeant Francis Scott Crump, and Officer Raymond McClain testified that the appellant fired at them in the alley behind Marta Cruz's house. Officer Robert Wilcox arrested the appellant for driving while intoxicated in September 2005, and several witnesses testified that the appellant was uncooperative, screamed profanities, and threatened to kill Officer Wilcox when the appellant got out of jail. Officer Melquiades Irizarry testified that she arrested the appellant for public intoxication on June 6, 2004. Officer Brandi Kramer testified that she encountered the appellant in an intoxicated state on December 25, 2004, and that she would have arrested him for public intoxication, but a relative appeared at the scene and took responsibility for him. David Huerta testified that he heard a "scuffle" at Cruz's house in September 2005; when he approached Cruz and the appellant and informed them that he intended to call the police, the appellant told him

---

[104] *Blue*, 125 S.W.3d, at 493.

[105] *Berry v. State*, 233 S.W.3d 847, 860 (Tex. Cr. App. 2007).

"You call the damn police. I'll take them down, too, with me."

The appellant called Marta Cruz to provide evidence with respect to the mental-retardation and mitigation special issues. However, evidence demonstrating future dangerousness emerged on both direct and cross-examination. Cruz testified that on September 11, 2005, the appellant was angry that she was not answering her cell phone and left several voice messages threatening to "fuck [her] up." He waited for her to arrive home, and when she got home he pulled a steak knife from the kitchen and forced her to go into the bedroom. When she threatened to call the police, the appellant grabbed her phone and dialed 911 himself before hanging up. When the police responded to the call, an officer noticed that Cruz had bruises on her leg and arm. She told the officer that during an argument approximately a week earlier, the appellant had pushed her into an exercise machine. Cruz further testified that the appellant had told her that after breaking up with a previous girlfriend and then seeing her with other men at a club, he retrieved a knife from his car but could not find the ex-girlfriend afterwards.

The defense evidence rebutting future dangerousness included a number of family members, friends, and co-workers who testified about the appellant's good character. Several witnesses, including Cruz, suggested that the appellant was violent only when he had been drinking. In addition, detention officers in the jail where the appellant was held for nearly two years testified that the appellant had behaved well.

The defense also introduced expert witnesses, Dr. Jonathan Sorensen and Dr. Mark Vigen. Dr. Sorensen, an expert on risk assessment and future dangerousness, testified that he performed an actuarial study to determine the likelihood that the appellant would commit acts of violence while incarcerated. Relying on certain characteristics of the appellant and data on

disciplinary infractions from the Texas Department of Criminal Justice, Dr. Sorensen testified that the appellant's likelihood of committing a violent act over a lifetime of incarceration was 8.1 percent, while the overall base rate is 16.4 percent. Dr. Vigen, a psychologist in private practice, testified that the prisons run by the Texas Department of Criminal Justice are well-run prisons. The corrections officers are well-trained and are able to effectively control the inmates, resulting in low rates of violence within the prison system. He further opined that "the likelihood that [the appellant] will continue to commit violent behavior which would be a threat to the prison society is very low."

Viewing all of the evidence in the light most favorable to the jury's finding, a rational trier of fact could have found beyond a reasonable doubt that there is a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society. The State presented evidence that the appellant had a history of violence toward girlfriends, including multiple threats and assaults against Cruz and an attempt to assault a previous girlfriend. The appellant also had a criminal history of DWI and public intoxication. Perhaps most importantly, the appellant made several statements indicating his willingness to kill police officers, directly threatened to kill a police officer during a DWI arrest, committed aggravated assault by shooting at multiple police officers on the night of the offense, and ultimately shot and killed Officer Jackson. The appellant's propensity for threats and violence against police officers could prove to a reasonable juror that the appellant would be particularly likely to commit criminal acts of violence within prison society, where the appellant would be in

frequent contact with prison personnel.[106] Point of error fifty-three is overruled.

### C. Review of Mitigation

In point of error thirty-nine, the appellant acknowledges in his brief that this Court "does not review the sufficiency of the evidence to support a jury's negative answer to the mitigation special issue," but argues that "the failure to do so violates his constitutional and statutory rights and renders the statute unconstitutional." In point of error forty, the appellant argues that the jury's verdict on the mitigation special issue is against the great weight and preponderance of the evidence.

In *McFarland v. State*,[107] we held that appellate review of the jury's answer to the mitigation special issue is not constitutionally required: "So long as the jury is not precluded from hearing and effectuating mitigating evidence, we have never regarded appellate review of mitigating evidence to be an essential component of a constitutionally acceptable capital punishment scheme."[108] We decline to overrule this clear precedent. Points of error thirty-nine and forty are overruled.

---

[106] In *Blue v. State*, this Court decided that evidence was legally sufficient to support a finding of future dangerousness under facts similar to the present case. The appellant in *Blue* killed his girlfriend by dousing her with gasoline and setting her on fire. The State showed that the appellant had a history of violence, especially toward current and former girlfriends. The appellant presented evidence of good character and evidence that he had a drug and alcohol problem at the time of the offense. He also presented evidence from prison employees that he had no record of violence for the seven years he was incarcerated on death row after his trial and before a second punishment hearing. Finally, the appellant's psychiatric expert testified that there was not a statistical probability that the appellant would commit future acts of violence, and that the appellant's violence was mostly "relationship driven." On the other hand, the State presented evidence that the appellant was "pounding and screaming" at county jail personnel while he was incarcerated at that location for his second punishment hearing. We found that the facts of the offense and the other evidence of appellant's prior history of violence were sufficient to support the jury's affirmative finding on future dangerousness. 125 S.W.3d, at 496.

[107] 928 S.W.2d 482 (Tex. Cr. App. 1996).

[108] *Id*, at 499; *see also Jackson v. State*, 992 S.W.2d 469, 481 (Tex. Cr. App. 1999).

## IX. PREVIOUSLY DECIDED POINTS OF ERROR

In points of error fifty-four through seventy-nine, the appellant copies twenty-six points of error originally presented in the Amended Brief for Appellant in *Saldano v. State*.[109] The *Saldano* points of error are, respectively, 19, 25, 28, 30, 38-41, 44-46, 51-62, and 64-66; these points of error have been altered only by deleting some of the argument contained within them and adding a few non-substantive changes.[110] Points of error fifty-four through sixty-four in the present case challenge the constitutionality of the jury charge at the punishment phase, while points of error sixty-five through seventy-nine challenge the constitutionality of Texas death penalty procedure. In his brief, the appellant concedes, as did the appellant in *Saldano*,[111] that the latter points of error "have been previously submitted to this Honorable Court; which previously has turned them down."

The appellant does not present any facts that distinguish the present case from *Saldano*, nor does he present any new legal authority suggesting that we should reconsider our disposition of these issues. Therefore, as in *Saldano*, we believe it sufficient to dispose of points of error fifty-four through sixty-four "by recognizing that the trial court submitted a charge consistent with applicable state statutes, which have withstood numerous constitutional challenges."[112] Further, we will "decline appellant's invitation to review our prior decisions"[113] on the issues

---

[109] 232 S.W.3d, at 100-08. The appellant's counsel on appeal was also appellate counsel for Saldano.

[110] Clear artifacts from *Saldano* remain, such as outdated citations to authority, misnumbered special issues, and quotations from the jury charge in *Saldano*, which was different from the charge in the present case.

[111] 232 S.W.3d, at 108.

[112] *Id.*, at 107.

[113] *Id.*, at 108-09.

raised in points of error sixty-five through seventy-nine. Points of error fifty-four through seventy-nine are overruled.

We affirm the judgment of the trial court.

Delivered: May 5, 2010.

Do not publish.